Kadair, Appellant, *v.* Pittsburgh Railways Co.

Argued September 28, 1955. Before STERN, C. J., STEARNE, JONES, MUSMANNO and ARNOLD, JJ.

*L. Pat McGrath,* with him *Joseph H. Ridge* and *Peter F. Flaherty,* for plaintiffs, appellants.

*James A. Geltz,* with him *Leo Daniels,* and *Prichard, Lawler & Geltz,* for defendant, appellee.

*V. C. Short,* with him *Clem R. Kyle,* for defendant, appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 14, 1955:

On October 4, 1950, David Kadair, 15 years of age, was seriously injured through the combined negligence of the Pittsburgh Railways Company and the Bailey-Farrell Company, defendants in this case. In the ensuing lawsuit the jury returned a verdict in the sum of $3,000 in behalf of the minor David and $5,000 for his father and guardian Morris Kadair. In the Court below the plaintiff filed a motion for a new trial al-

leging inadequacy of verdict. The Court refused the motion, and this appeal followed.

David Kadair's injuries were described by Dr. J. W. Fridette as follows: ". . . the X-rays showed that he had transverse fractures through the lower end of both the thigh bones, and these fractures were displayed and required an operation as soon as the condition of the patient would permit. The operation was performed on October 6, 1950, and two oblique incisions were made over the anterior surface of the lower third of the thigh exposing the fracture sites, and the fractures were placed in position and maintained in that position by six screw plates of steel." These plates were described as being 6 inches long and in excess of a quarter of an inch wide. When asked whether the plates would remain within the patient's legs permanently, Dr. Fridette explained: "They do unless they cause trouble. Ordinarily we expect them to remain permanently. Occasionally they become loosened and may become a source of irritation and require removal."

The boy remained in the hospital for four months during most of which time he was immobilized in a cast which extended from his chest to his feet. After his discharge from the hospital David returned for physiotherapy treatments. An entry in the records of the physical therapy department of the hospital reads as of May 22nd [presumably 1951]: "Baking and massage and manipulation of knees three times a week."

Dr. D. I. Jamison, a specialist in neuro-psychiatry, testified that David suffered a post traumatic neurosis as a result of his physical injuries: "Q. What is the prognosis for the future of this boy, Doctor? A. Of course from a medical standpoint it is indefinite, but the fact that this has been going on since 1950, since the accident, it is a permanent injury. Q. What is your opinion of the ability of this boy to continue his educa-

tion? A. The danger of this type of case is that if the frustration becomes too great later on and he isn't able to obtain the education he has set himself for, there is a possibility of him falling over the line into the true schizophrenic, and that might require hospitalization or institutional care. Q. Permanent? A. Permanent if he goes over the line. Q. Now, what about his ability to work as the ordinary boy or man usually does, in the future? A. From the physical standpoint I believe the boy is in good shape. I know the fractures have been healed, but from the emotional standpoint and the fact that he isn't able to sustain any effort because of this fear that is being directed there, *he wouldn't be able to sustain labor in the competitive market.*" (Emphasis supplied.)

In view of this pessimistic prognosis, which was not contradicted by any medical testimony on the part of the defendants, it would appear that the verdict of $3,000 for the boy did not meet the objective realities of the case. Not to be able to "sustain labor in the competitive market" means a seriously partial or total impairment of earning power. The Court's charge on this item of damages was inadequate, namely, "If you think that will affect his earning power after he reaches the age of twenty-one—remember, if you award him anything for that it should be reduced to its present worth."

The total out-of-pocket expenses and loss of earnings to the father, Morris Kadair, from the date of the accident to the date of trial, amounted to $4,864. The estimated cost of medical treatment and loss of earnings from the date of the accident until attainment of the boy's majority was estimated to be $1900, or a total loss in damages to the father of $6764.

A study of the record would indicate that the total verdict of $8,000, in view of all the circumstances, was

54

sufficiently inadequate to justify ordering a new trial.*
In view of our decision in this respect, it is unnecessary to discuss other matters advanced by plaintiff's counsel in his brief and at oral argument.

Judgment reversed with a venire facias de novo.

* See *Nikisher v. Benninger*, 377 Pa. 564.